IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **ERIKA J. RYAN,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   Case No. CIV-24-CV-210-SPS |
| | ) |
| **LELAND DUDEK, Acting** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

The claimant Erika J. Ryan, requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*.

§ 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

**Procedural History**

The Court has jurisdiction under 42 U.S.C. § 405(g). Claimant was born on June 26, 1976, and was 41 years old on the alleged disability onset date. (Tr. 21). She has completed high school and has past relevant work as a nurse assistant. (Tr. 21, 53-53, 184). This case involves two different applications for benefits, with two separate and distinct relevant time periods. Here, the administrative decision consists of two main findings. First, for purposes of the Title II claim for disability, the administrative law judge (ALJ) found Claimant was not disabled prior to her date last insured, December 31, 2017. (Tr. 556-57). Second, for purposes of the Title XVI claim, the ALJ found Claimant was disabled as of her application date, February 11, 2022, which was the earliest date she was entitled to disability under her Title XVI claim. (Tr. 556-57). *See* 20 C.F.R. § 416.335 ("[T]he earliest we can pay you benefits is the month following the month you filed the application"). Claimant contends the ALJ erred in finding her not disabled under Title II. However, Claimant must carry her burden to prove disability in 2017.

Claimant applied for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act) in 2019, alleging disability as of May 2017. (Tr. 155). After an ALJ denied her application (Tr. 10-28), the decision was remanded for further evaluation of Dr. Keith Holder's medical opinion. Claimant does not challenge the ALJ's treatment of Dr. Holder's opinion. In the interim, in February 2022, Claimant filed an additional application for supplemental security income (SSI) under Title XVI of the Act. (Tr. 880). On remand, the agency's Appeals Council ordered the two claims consolidated. (Tr. 679). The ALJ held another hearing (Tr. 605-23) and found Claimant was not disabled for purposes of her Title II claim but became disabled in February 2022 for purposes of her Title XVI claim. (Tr. 556-57). *See* 20 C.F.R. § 404.984(d).

**Decision of the Administrative Law Judge**

The ALJ made her decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had severe physical impairments, but nonsevere mental impairments. (Tr. 543-545). She determined that, prior to February 11, 2022—the SSI application date—Claimant had the residual functional capacity (RFC) to perform light work, except for frequent bilateral handling and fingering. (Tr. 546). *See id*. § 404.1545(a)(1) ("Your [RFC] is the most you can still do despite your limitations."). At steps four and five, the ALJ found this RFC would allow Claimant to perform her past relevant work as a personal attendant, as well as other work existing in significant numbers in the national economy. (Tr. 552-53). The ALJ determined that, beginning on February 11, 2022, Claimant's RFC changed, such that it was more restrictive. (Tr. 553). As a result, she found Claimant was disabled as of that date for purposes of her Title XVI claim. (Tr. 556).

**Review**

The relevant evidence before the ALJ reflects that Claimant injured her back at work in March 2009 and was diagnosed with a lumbar strain/sacroiliac joint dysfunction. (Tr. 485-86, 489, 493-95, 1089, 1641). This was prior to the May 2017 alleged disability onset date. She was treated conservatively and released to light work activity by mid-2009. (Tr. 496). By late 2009, based on a functional evaluation, occupational medicine physician Keith Holder, M.D. found Claimant capable of performing medium lifting, with limited bending, stooping, and twisting. (Tr. 507-08). While Claimant was found to have reached maximum medical improvement, she remained off work due to a pregnancy. (Tr. 513). In 2012, almost three years after her initial injury Claimant continued to complain of "aching pain" in her back. (Tr. 513). However, another occupational medicine physician, Terry Clark, M.D., confirmed Claimant was at maximum medical

improvement and released her for full/ regular work, without restrictions. (Tr. 513-14). Imaging of Claimant's lower back showed no more than mild degenerative changes. (Tr. 459, 460, 1201, 1202, 1552, 1553).

Claimant also saw a primary care physician, Janet Garvin, D.O., but her treatment for Claimant's back pain was minimal. (Tr. 429-48). In 2014, Dr. Garvin filled out paperwork so Claimant could get a handicap placard for parking. (Tr. 1293, 1395, 1672, 1714). In 2015, Claimant reported difficulties with depression and Dr. Garvin started her on an anti-depressant. (Tr. 435-36). Otherwise, Claimant's evaluation and treatment for all conditions was quite limited through 2016. (Tr. 429-48).

In 2016, Claimant presented to neurologist Steve-Felix Belinga, M.D. (Tr. 270, 393, 520, 1123, 1154, 1465, 1597). She mentioned ongoing issues with back pain, and despite a lack of earlier complaints or treatment, she also discussed a history of migraines and nerve pain about the right side of her face. (Tr. 270). Claimant had a very antalgic gait. (Tr. 271). But she had no other neurologic deficits upon examination; she retained normal muscle bulk and tone, full strength, and normal sensation. (Tr. 271). Dr. Belinga ordered imaging of Claimant's neck and low back, as well as a nerve conduction study. (Tr. 271-73). The neck MRI showed only mild degenerative changes, and the back MRI likewise showed only early arthritic changes at one level. (Tr. 404, 406). A nerve conduction study showed evidence of sensory neuropathy in both legs and mild sensory changes in both hands/wrists. (Tr. 269-70). Dr. Belinga started Claimant on medication as treatment for pain. (Tr. 272-73).

Approximately one month before her alleged disability onset date, in April 2017, Claimant reported her neck pain and headaches were better, and she acknowledged her pain medication was effective. (Tr. 398-99). Clinically, she continued to have no neurologic deficits. (Tr. 398-99).

Evidence from the relevant Title II period—from the alleged onset date, May 10, 2017, through the date last insured, December 31, 2017, reflects that by her May 2017 alleged disability onset date, Claimant was established with her primary care physician, Dr. Garvin, as well as her neurologist, Dr. Belinga. (Tr. 317, 398). However, during the eight-month relevant period, she only visited her primary care physician on one occasion in June 2017. (Tr. 317, 1219, 1570). During that visit, Claimant discussed an acute rash (scabies), but she did not mention her alleged disabling impairments or any other physical or mental health problems. (Tr. 317-319). She did not see her neurologist at all during this period, nor did she seek any other medical treatment.

During the Title II disability application process, two separate State agency medical consultants, David Coffman, M.D. and Mohamed Kanaa, M.D., and two separate State agency psychological consultants, Brian Snider, Ph.D. and Mary Rolison, Ph.D., reviewed Claimant's case. (Tr. 66-68, 77-79). They all agreed there was insufficient evidence to assess Claimant's physical and mental conditions on or before the date last insured. (Tr. 66-68, 77-79).

Evidence after the date last insured, December 31, 2017, through the next application date, February 11, 2022, does not suggest any disabling issues beginning prior to December 31, 2017. In January 2018, Claimant was seen in primary care with complaints of an ongoing rash, fatigue, and migraines. (Tr. 314, 1216, 1567). However, upon examination, she had no noted rash or swelling in her joints. (Tr. 315).

In May 2018, Claimant saw a rheumatologist, Kristin Peck, PA, for further evaluation of her symptoms. (Tr. 328, 1230, 1581). At that time, she had some tenderness in her hands, as well as tenderness and decreased motion of her hips, but she had no signs of swelling or loss of strength. (Tr. 330). She walked with a normal gait. (Tr. 330). After a thorough evaluation, PA Peck essentially ruled out diagnoses of lupus or inflammatory arthritis. (Tr. 328). At most, she suggested

Claimant's symptoms were consistent with fibromyalgia. (Tr. 329). For the rest of 2018 and all of 2019, Claimant followed with her primary care physician, Dr. Garvin. (Tr. 308-13). She was prescribed medications for pain and anxiety, but otherwise, her treatment was limited. (Tr. 308-13).

More than two years after her date last insured, in early 2020, Claimant returned to her neurologist, Dr. Belinga. (Tr. 352, 415, 1253, 1462, 1483). At that point, she discussed worsening symptoms in her hands. (Tr. 352). Ultimately, Claimant was diagnosed with bilateral carpal and cubital tunnel syndrome and had surgeries on both hands. (Tr. 351, 363, 381, 389, 1054, 1250, 1264, 1289, 1495, 1516, 1519). By August 2020, only one month after her second surgery, Claimant reported improved sensation in both hands. (Tr. 426). Claimant continued to follow with her primary care physician, Dr. Garvin. (Tr. 461). She was started on Gabapentin for a new diagnosis of neuralgia. (Tr. 461). And in October 2020, Dr. Garvin renewed her disability parking placard. (Tr. 1292, 1394, 1671, 1713).

In November 2020, almost three years after her date last insured, Claimant underwent another functional capacity evaluation. (Tr. 477-84). Based on the results of testing at that time, the evaluator, Velvet Medlock, MSPT, reported Plaintiff was able to occasionally use both hands for manipulative movements. (Tr. 475). After November 2020, the record was silent regarding ongoing treatment until much later, in early 2022. There is no evidence of ongoing evaluation or treatment of Claimant's physical or mental impairments.

Beginning in early 2022, evidence as of the Title XVI application (and established onset date), February 11, 2022, Claimant's impairments worsened. (Tr. 553-55). By June 2022, she was complaining of increased pain in her neck and back, as well as worsening neuropathy in her legs. (Tr. 1349). Nerve testing at that time showed severe sensory neuropathy in both legs. (Tr. 1348-

39). For purposes of Claimant's Title XVI claim for benefits, two new State agency medical consultants, Peyton Osborne, M.D. and Ronald Painton, M.D., reviewed her case in March 2022 and June 2022, respectively. (Tr. 653-54, 662-64). Dr. Osborne found insufficient evidence to determine the severity of Claimant's physical impairments. (Tr. 653). Later, however, Dr. Painton found Claimant had severe physical impairments and was limited to a range of light work, except for frequent use of her hands for handling and fingering. (Tr. 662-63).

Claimant continued to follow with her neurologist, Dr. Belinga, throughout 2022, and she was also referred for another rheumatologic workup. (Tr. 1396-1401, 1341-46). She was treated with multiple new medications (Tr. 1344, 1346, 1350, 1400-01). In late 2022, Claimant attended a psychological consultative examination, during which she discussed worsening neuropathy throughout her body, as well as issues with anxiety and panic. (Tr. 1384-1386). She was ultimately diagnosed with an anxiety disorder and other specified trauma and stressor-related disorder. (Tr. 1388).

A State agency psychological consultant, Deanna Gallavan, Ph.D., reviewed Claimant's case in November 2022, in connection with her Title XVI application for benefits. (Tr. 661). She found the totality of the evidence supported "no more than mild impairment in global and work-related functioning," and as such, Claimant's mental impairments were not severe. (Tr. 661).

With respect to her Title II claim, Claimant asserts the ALJ failed to assess her mental impairment at step two as nonsevere, improperly analyzed her RFC during the time period at issue, and failed in finding she could return to her past relevant work at step four. The Court finds the decision of the ALJ is consistent with the evidence.

In the instant case, the ALJ determined at step two that Claimant's mental impairments, including her mental impairments prior to the date last insured, were not severe impairments, and

as such, she did not require any mental limitations in her RFC. (Tr. 544-45, 546, 551). At step two, Claimant bore the burden of proving her medical conditions were "severe." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003); *see also, e.g.*, 20 C.F.R. §§ 404.1509, 404.1521, 404.1522(a) (defining and describing "severe" and "not severe" impairments). Here, the ALJ found Claimant met her burden to prove she had some severe impairments—including musculoskeletal and neurological impairments—which met the duration requirement and limited her ability to do basic work activities. (Tr. 543). To the extent the ALJ further found Claimant's mental impairments were not severe, those findings are adequately supported.

The ALJ acknowledged Claimant's diagnoses of "anxiety, depression, and posttraumatic stress disorder (PTSD)," and concluded these were not severe impairments because the symptoms were mild and well-controlled with medications. (Tr. 544). *See Webb v. Astrue*, 2011 WL 124443, at *3 (D. Colo. Jan. 14, 2011) (affirming where ALJ considered the claimant's conservative treatment in concluding an impairment was not severe). The record supports the ALJ's findings. As the ALJ noted, prior to her date last insured, there was very little evidence of record regarding Claimant's mental health treatment. At most, the record showed she was on medications for anxiety and depression, as prescribed by her primary care provider, Dr. Garvin, with no reports of ongoing symptoms or need for any additional interventions or restrictions. (Tr. 433-34, 441-42).

As noted by the Commissioner, Claimant attempts to rely on several exhibits, most of which were dated well after her date last insured, as well as findings from the psychological consultative examination. (Pl. Br. 14-15, citing Tr. 311, 433, 435, 1344, 1388). Yet, this one-time examination was performed in October 2022, almost five years after the expiration of the date last insured. (Tr. 1384). Thus, those findings were not relevant to Claimant's functional abilities prior

to December 31, 2017. To the extent they were relevant to Claimant's Title XVI claim, and her functional abilities after the application date, February 2022, is not relevant here because Claimant does not dispute the ALJ's ultimate finding of disability during that period.

     Further, the question at step two of the sequential evaluation is only whether a claimant has any impairment or combination of impairments that is severe, that is, an impairment that significantly limits her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1522. If a claimant has any severe impairment, the ALJ continues with the sequential evaluation and, between steps three and four, assesses a claimant's workplace limitations considering all impairments, severe and non-severe. 20 C.F.R. § 404.1545(a)(2). So long as the ALJ finds some severe impairment at step two and then continues to consider all impairments at subsequent steps, earlier errors at step two are immaterial and do not justify remand.

     Here, as noted *supra*, the ALJ found Claimant had severe impairments, along with several nonsevere impairments at step two. (Tr. 542-45). She then continued in the sequential evaluation and expressly discussed Claimant's ongoing symptoms—including her complaints of depression and anxiety—in formulating the RFC between steps three and four. (Tr. 546-47). Thus, any mistake in calling some impairments nonsevere was obviated when the ALJ addressed those impairments and related limitations when assessing the RFC.

     Claimant next contends the ALJ improperly assessed her RFC during the relevant time period. The ALJ found Claimant had the RFC to perform light work with restrictions. (Tr. 546-552). The RFC is the most Claimant can do on a regular and continuing basis despite her limitations. 20 C.F.R. § 404.1545, 20 C.F.R. §416.945. The RFC should not include those activities that Claimant can do sporadically; instead, it can only include what he can sustain for eight hours a day, five days a week. Social Security Ruling 96-8p. The ALJ is required to consider all

Claimant's medically determinable impairments, singly and in combination; the statute and regulations allow nothing less and a failure to do so is reversible error. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir 2006). The ALJ may not ignore evidence that does not support her decision, especially when that evidence is significantly probative. *Biggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001). Furthermore, the ALJ must support her conclusions with specific references to the evidence in the record and interpret that evidence fairly. *Winfrey v. Chater,* 92 F.3d 1017, 1024 (10th Cir. 1996) (the ALJ erred by failing to relate his conclusions to the evidence).

Likewise, *SSR* 16-3p states that when considering an individual's subjective statements, the ALJ considers first, whether an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms even exists, and then second, whether the objective medical evidence is consistent with the individual's statements. When evaluating severity, the ALJ must address the objective medical *and other* evidence regarding the intensity, persistence, and limiting effects of the claimant's symptoms. *See Carpenter v. Astrue,* 537 F.3d 1264, 1268 (10th Cir. 2008). This includes the factors as outlined in *SSR* 16-3p, such as an individual's repeated attempts to find relief from pain, the drugs prescribed for pain, the side effects from pain medication, the effectiveness of the pain medication, and how an individual's activities of daily living have been affected by her pain. *Id.*

In the instant case, the ALJ reasonably considered all medical source statements of record. No medical source of record offered any opinion on Claimant's work-related functional abilities during the relevant Title II period. In fact, four separate State agency medical consultants reviewed the record and found it insufficient to assess any work limitations based on Claimant's conditions on or before the date last insured. (Tr. 66-68, 77-79). Although there were several opinions offered,

the ALJ correctly described them as "remote in time" to Claimant's claim for Title II benefits. (Tr. 550-51). For instance, in 2009, Dr. Holder provided two separate statements regarding work restrictions for Claimant. (Tr. 495-96, 507-08). In September 2009, he stated Claimant could return to work, so long as she did not lift over 20 pounds and had no repetitive back motions. (Tr. 496). Later, in December 2009, he suggested Claimant had permanent limitations in her ability to bend, stoop, and twist. (Tr. 508). In 2012, a second occupational medicine physician, Dr. Clark, examined Claimant and found she could return to work with no restrictions. (Tr. 513-14). None of these opinions suggested Claimant was any more limited prior to December 31, 2017, when she was last eligible for Title II benefits, and in any event, the ALJ properly considered all these statements. (Tr. 550-51). *See* 20 C.F.R. § 404.1520c. The ALJ found the opinions were not persuasive, since they were not consistent with other evidence of record. (Tr. 551). She explained that, "[d]ue in part to their remoteness in time, these opinions are inconsistent with the later objective medical evidence." (Tr. 551).

Next, the ALJ found Claimant's reported symptoms were inconsistent with other evidence. The RFC assessment must address the claimant's reported symptoms. 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304. "Since the purpose of the [symptom] evaluation is to help the ALJ assess a claimant's RFC, the ALJ's [symptom] and RFC determinations are inherently intertwined." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). The ALJ here recognized Claimant's claims of debilitating symptoms and acknowledged her allegations of severe pain. (Tr. 547). However, the ALJ found Claimant's reported symptoms inconsistent with other evidence. (Tr. 547, 549). This finding is due "particular deference." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002). The Court must uphold an ALJ's symptom evaluation when it is supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). The ALJ

provided several well-supported reasons for concluding Claimant's reported symptoms involving chronic pain, migraines, and neuropathy—particularly prior to the date last insured of December 31, 2017—were not as severe as she claimed, including (1) objective medical evidence, (2) conservative treatment, (3) effective treatment, and (4) inconsistencies in complaints. (Tr. 548-50).

After discussing the objective evidence referenced *supra*, the ALJ considered Claimant's conservative treatment and her response to treatment. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). For example, the ALJ correctly pointed out Claimant sustained a work-related back injury in 2009 but was released to light work duty the same year and regular duty in 2012. (Tr. 548, citing Tr. 485-514; Tr. 550, citing Tr. 485-514). She further observed Claimant did not return for treatment until late 2016 (Tr. 548, citing Tr. 270-73). While Claimant was established with a neurologist and rheumatologist, her actual treatment was quite limited both before and immediately after her date last insured of December 31, 2017. (Tr. 328-30, 398-99). Taken together, the ALJ recognized that, not only was there a significant gap in treatment from her initial injury to the date she re-established treatment, but when she did return for further evaluation, her treatment was limited.

Further, Claimant's symptoms were well controlled on medications. Among other things, she reported her headaches and neck pain were getting better in April 2017, one month prior to her alleged onset date and just a few months after starting medication (*see e.g.*, Tr. 398-99 (Claimant reported her headaches and neck pain were getting better in April 2017, one month prior to her alleged onset date)). As another example, in the eight months relevant to Claimant's Title II disability claim, she did not seek medical treatment for any troubling symptoms related to her alleged disabling impairments. And in any event, the ALJ acknowledged Claimant's conditions did worsen—though she reasonably concluded on this record that it was not until February 2022—

consistent with the first date Claimant was eligible for SSI benefits—that her RFC changed. (Tr. 553-55).

The ALJ also considered Claimant's activities of daily living. 20 C.F.R. § 404.1529(c)(3)(i). Here, the ALJ acknowledged Claimant's alleged limitations, but also reasonably observed Claimant nonetheless remained able to manage her personal care, care for pets, prepare meals, complete some household chores, drive, and go out alone. (Tr. 549 (citing Tr. 201-08, 263-66)).

In regard to any inconsistences in the evidence, including conflicts between Claimant's statements and the rest of the evidence, these are additionally relevant to the subjective symptom evaluation. 20 C.F.R. § 404.1529(c)(4). Here, the ALJ pointed out several inconsistencies between Claimant's allegations and other evidence of record. (Tr. 549). In particular, she highlighted the fact Claimant's allegations of constant migraines, and other pain, were not consistent with her reports to providers. (Tr. 549). Likewise, Claimant's treatment with medications was relatively conservative. Such inconsistencies factored into the ALJ's discounting of Claimant's complaints of debilitating symptoms. *See e.g., Shepherd v. Apfel,* 184 F.3d 1196, 1202 (10th Cir. 1999) (ALJs determination supported by inconsistencies between claimant's testimony regarding his inability to stand because of pain and statements to the consultative examiner and the fact that he takes only aspirin). Here, the ALJ provided several good reasons for finding Claimant's reported symptoms were inconsistent with other evidence, particularly prior to her date last insured.

Finally, substantial evidence supports the ALJ's findings at steps four and five of the sequential evaluation. The ALJ found Claimant's past work as a personal attendant met the definitional requirements of "past relevant work" and then properly concluded she could perform that work prior to her date last insured. The ALJ assessed Claimant's RFC, delineating the

particular functional areas in which she was limited. (Tr. 546). The ALJ then assessed the physical and mental demands of Claimant's past work, based on the record before her, and she additionally relied on vocational expert testimony. 20 C.F.R. § 404.1560(b)(2) (ALJ may rely on vocational expert testimony at step four); *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) (same).

Furthermore, the ALJ asked the vocational expert (VE) about a hypothetical individual with limitations the ALJ ultimately found coincided with Claimant's RFC. (Tr. 546, 617). The VE testified an individual with those limitations could perform her past work as a personal attendant. The ALJ then relied on that testimony, consistent with the *Dictionary of Occupational Titles*, to find the Claimant's RFC would allow her to perform her past relevant work prior to her date last insured. (Tr. 552, 596). Thus, the ALJ adequately discharged her step four responsibilities. *Doyal v. Barnhart*, 331 F.3d 758, 760-61 (10th Cir. 2003).

Further, regardless of the step four findings the ALJ also alternatively found at step five, Claimant was not disabled because there were also a significant number of jobs in the national economy she could perform. (Tr. 552-53). In doing so, she again reasonably relied on testimony from the vocational expert in response to a hypothetical question which matched the RFC. (*see* Tr. 552-53, 616-17).

## Conclusion

The record demonstrates Claimant's back pain was longstanding, not very limiting, and treated conservatively. Claimant did not seek any treatment for the back pain (or anything other than an acute rash) during the eight-month period relevant to her Title II disability claim. Furthermore, the evidence post-dating her eligibility period for Title II benefits does not appear to indicate any disabling issues relating back to the relevant period ending on December 31, 2017. To the extent her condition later worsened significantly, that did not happen until approximately early 2022—that is, several years after

December 31, 2017, the date by which she needed to prove she became disabled to be found eligible for Title II disability benefits. The Court finds that correct legal standards were applied by the ALJ, and the Commissioner's decision is therefore supported by substantial evidence. Accordingly, the Court finds the decision of the Commissioner is hereby AFFIRMED.

    **IT IS SO ORDERD this 16th day of April, 2025.**

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**